# UNITED STATES DISTRICT COURT
# DISTRICT OF MAINE

| | |
|---|---|
| *MARIE Y. FREESE,* ) | |
| ) | |
| *Plaintiff* ) | |
| ) | |
| v. ) | *Docket No. 07-1-P-S* |
| ) | |
| ) | |
| *MICHAEL J. ASTRUE,* ) | |
| *Commissioner of Social Security,* [1] ) | |
| ) | |
| *Defendant* ) | |

## *RECOMMENDED DECISION ON DEFENDANT'S MOTION TO DISMISS*

On March 22, 2005 the plaintiff, who had been seeking Social Security Disability ("SSD") benefits since 1979, scored a mixed victory when, following a remand by this court, an administrative law judge granted benefits pursuant to a 2002 application but refused to reopen prior unsuccessful SSD applications. *See* Record at 357-59. She returns to this court challenging the refusal to reopen applications filed in 1979, 1991 and 1992. *See generally* Plaintiff's Itemized Statement of Errors ("Statement of Errors") (Docket No. 8).[2] She acknowledges that courts generally have no power to review decisions not to reopen prior applications; however, she points out that an exception is made

---

[1] Pursuant to Fed. R. Civ. P. 25(d)(1), I have substituted currently serving Commissioner of Social Security Michael J. Astrue as the defendant in this matter.

[2] As the commissioner observes, much is at stake. *See* Motion To Dismiss ("Motion") (Docket No. 9) at 2. Social Security regulations limit retroactivity of SSD payments to the twelve months immediately preceding the application date. *See* 20 C.F.R. § 404.621(a)(1). Thus, the plaintiff's victory on her April 3, 2002 application secures an award of retroactive benefits dating back only to April 2001. Success in her bid to reopen the 1979, 1991 and/or 1992 applications could result in as much as approximately sixteen years worth of additional retroactive benefits covering the period from December 1984 (five months after the date she was determined to have become disabled) forward. *See* Finding 1, Record at 359; 20 C.F.R. §§ 404.315(a)(4), 404.316(a) (describing mandatory five-month waiting period from date of disability to time SSD benefits begin).

in circumstances in which a plaintiff presents a colorable constitutional claim. *See id.* at 3; *see also, e.g., Dudley v. Secretary of Health & Human Servs.*, 816 F.2d 792, 795 (1st Cir. 1987) ("It is well-settled that, because the 'final decision of the Secretary' refers to the Secretary's initial substantive decision on a claim for benefits, [42 U.S.C.] § 405(g) cannot be read to authorize judicial review of alleged abuses of agency discretion in refusing to reopen claims for social security benefits"; however, "judicial review may be afforded in rare instances where the Secretary's denial of a petition to reopen is challenged on constitutional grounds") (citations and internal quotation marks omitted). She invokes that exception, positing that she makes out a colorable claim of denial of procedural due process during adjudication of each of her three prior applications. *See* Statement of Errors at 3-5. The commissioner disagrees; accordingly, he moves pursuant to Federal Rule of Civil Procedure 12(b)(1) to dismiss the instant complaint for lack of subject-matter jurisdiction. *See* Motion at 1-2. For the reasons that follow, I recommend that the Motion be granted.

## I. Applicable Legal Standard

When a defendant moves to dismiss pursuant to Rule 12(b)(1), the plaintiff bears the burden of demonstrating that subject-matter jurisdiction exists. *Lundquist v. Precision Valley Aviation, Inc.*, 946 F.2d 8, 10 (1st Cir. 1991); *Lord v. Casco Bay Weekly, Inc.*, 789 F. Supp. 32, 33 (D. Me. 1992). Both parties may rely on extra-pleading materials. 5A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1350 at 213 (2d ed. 1990); *see also Hawes v. Club Ecuestre el Comandante*, 598 F.2d 698, 699 (1st Cir. 1979) (question of jurisdiction decided on basis of answers to interrogatories, deposition statements and an affidavit).

## II. Background

The plaintiff, who suffers from multiple sclerosis ("MS"), *see* Finding 3, Record at 359,

commenced her long-running efforts to secure SSD benefits when she first applied for them in 1979, *see id*. at 108. By notice dated December 7, 1979 that request was denied. *See id*. at 87-88. She took no appeal of that decision. *See id*. at 72-73. This was the end of the matter until August 21, 1991, when a divorce prompted her to apply once again for SSD benefits. *See id*. at 73, 118. By notice dated October 23, 1991 her second request was denied on the basis that the medical evidence of record did not demonstrate that she was disabled on or before her date last insured of December 31, 1984. *See id*. at 89-91. Again, the plaintiff did not appeal the denial. *See id*. at 13. Nonetheless, on June 4, 1992 she filed a third application for SSD benefits. *See id*. at 118. By notice dated August 1, 1992 the third application was denied on *res judicata* grounds. *See id*. at 92-93. The plaintiff requested reconsideration, which was denied on or about January 27, 1993, again on the basis of *res judicata*. *See id*. at 95. The plaintiff took no further appeal. *See id*. at 13.

Some years elapsed before, on April 3, 2002, the plaintiff (represented this time by her current counsel) tried again, filing the application pursuant to which benefits ultimately were granted by decision dated March 22, 2005. *See id*. at 13, 96, 357-59. In connection therewith, the plaintiff's counsel submitted to the administrative law judge a memorandum of law dated February 4, 2003 arguing that "[a]n issue of constitutional dimensions requires that [the plaintiff] be allowed to reopen her 1979 and 1991 applications[.]" *Id*. at 208. Specifically, he argued that language in notices of initial denial of the plaintiff's 1979 and 1991 applications was defective and that the plaintiff, who was unrepresented by counsel in both instances, was misled by that flawed language, as a result of which she was denied procedural due process. *See id*. at 208-12. He submitted with his memorandum an affidavit of the plaintiff ("2002 Freese Aff.") in which she stated, *inter alia*:

> 2.     I applied for social security disability benefits in 1979 and again in August, 1991 and was denied. At those times I was suffering from multiple sclerosis and was not able to understand or cope with the process for pursuing my claim for social security benefits. However, I was told (I believe both orally and in writing) by

social security that even if I didn't pursue an appeal I could later reapply for benefits;

     5. [sic] Neither in 1979 or 1991 was I ever by anyone at Social Security told that if I did not pursue an appeal and instead waited and reapplied later when I had someone to help me with it I might be denied social security disability benefits on the basis that the issue had already been decided against me.

     6. [sic] I was also not told that a failure to pursue an appeal rather than later applying again, might prevent me from getting benefits back to one year prior to my previous application.

*Id*. at 213-14.[3]

By decision dated July 24, 2003 the administrative law judge rendered an adverse decision on the merits of the plaintiff's SSD application. *See id*. at 13-20. He also found no basis on which to reopen any determination on prior claims. *See id*. at 14. The plaintiff appealed that decision to this court, which ultimately reversed it and remanded the case for further proceedings. *See id*. at 361-75.[4]

Following remand, on March 8, 2005, the plaintiff's counsel penned a letter to the administrative law judge enclosing an affidavit of the plaintiff ("2005 Freese Aff.") and stating, in relevant part: "I am specifically requesting as [the plaintiff's] representative that you reopen her old application from 1979 which was improperly denied without constitutionally adequate notice, treat it as still pending in 1984 and determine her to have been disabled with an onset date of July 7, 1984 in addition to acting upon her current application." *Id*. at 389. The enclosed affidavit stated, *inter alia*:

     2.    I applied for social security benefits in 1979 and was denied. At that time I was suffering from multiple sclerosis and was having a hard time to understand or cope with the process for pursuing my claim for social security benefits. However,

---

[3] The Record also contains an affidavit of the plaintiff dated July 10, 2000 that her counsel evidently forwarded to a Social Security claims representative by cover letter dated September 25, 2001 in connection with a request to reopen her old applications. *See* Record at 108-11. The 2000 affidavit is nearly identical to the 2002 affidavit. *Compare id*. at 108-09 *with id.* at 213-14.

[4] With respect to the reopening issue, I stated: "The plaintiff notes that she challenges not only the administrative law judge's denial of her current application but also his refusal to reopen her prior claims. . . . However, she observes that she focuses on the merits of the current application inasmuch as any error in failing to reopen the prior claims would be moot if she could not prove entitlement to benefits on the merits of the current claim. Accordingly, I likewise focus on the merits of the current application." Record at 364-65 n.3.

4

> I was told (I believe both orally and in writing) by social security that even if I didn't pursue an appeal I could later reapply for benefits;
>
> 5. [sic] No one at Social Security told [me] that if I did not pursue an appeal and instead waited and reapplied later when I had someone to help me with it I might be denied social security disability benefits on the basis that the issue had already been decided against me.
>
> 6. [sic] I was also not told that a failure to pursue an appeal rather than later applying again, might prevent me from getting benefits back to one year prior to my previous application.
>
> 7. [sic] I did not have [an] attorney to help me with my 1979 claim. Had I known at that time that I needed to get a lawyer and pursue an appeal within 60 days in order to avoid losing out on benefits I would have pursued the claim through the appeal process rather than waiting and reapplying.

*Id*. at 398-99.

At the plaintiff's rehearing, held on March 8, 2005, the administrative law judge inquired: "[W]hat do we [have] for an onset date here? 12/1/84?" *Id*. at 404. Her counsel responded: "7/15/84 . . . and I, I picked that just because that takes us to a very detailed physical exam that shows her symptoms at that time. . . . I think that's the simplest way to go about this." *Id*. There was no discussion at rehearing of the plaintiff's bid to reopen any earlier applications. *See id*. at 401-05.

Shortly thereafter the administrative law judge issued his March 22, 2005 decision, finding the plaintiff to have been disabled since July 15, 1984, her amended alleged disability onset date. *See* Finding 5, *id*. at 359; *see also id.* at 357 (noting amendment of alleged disability onset date). With respect to the plaintiff's request to reopen one or more prior applications, he stated: "Also at issue is whether any of the determinations made with respect to prior applications filed by [the plaintiff] may be reopened and revised. The undersigned finds no basis for reopening any of the determinations made regarding prior claims." *Id*. at 357.

The plaintiff accompanies her opposition to the instant motion with a new affidavit. *See*

5

Plaintiff's Affidavit Submitted in Opposition to the Defendant's Motion To Dismiss ("2007 Freese Aff."), attached to Plaintiff's Opposition to the Defendant's Motion To Dismiss ("Opposition") (Docket No. 12). Paragraphs 2 through 5 of the new affidavit essentially repeat the substance of the 2005 affidavit. *Compare id*. ¶¶ 2-5 *with* Record at 398-99. The new affidavit adds:

> 6.  I do not remember the exact dates but in the late 1970's and early 1980's my regular doctor was Dr. Louis Bachrach who had his office at 85 Baribeau Drive in Brunswick, Maine. I saw him several times a year in that period and he treated my MS as well as other problems. I do not know what has happened to him since but he no longer has an office in Brunswick. I believe that he has retired and is now in Florida. After that the insurance changed doctors and I went to Martin's Point.
>
> 7.  I later reapplied in 1991. I was notified by Social Security that my claim was denied in October, 1991, but I do not remember the details. I did not have anyone representing me on this claim.
>
> 8.  At the time of my 1991 denial I was having a very hard time emotionally. In 1990 I was told I had cancerous cells in my uterus and in October I had to have a hysterectomy. Starting in August of 1991 and continuing into 1992 I was suffering from serious depression, in addition to the problems from my MS, because of the collapse of my marriage of over 30 years when my husband left me for another woman who was not disabled. Because of both the effects of my MS on my ability to think and concentrate and the further impact of the depression, I was not able to understand or respond in any way to the denial I got from Social Security during the 60 day appeal period from October into December, 1991.
>
> 9.  During this period in 1991 into 1992 I first saw a counselor at the Navy Base and then saw William Harrison because of my depression.
>
> 10. Finally in August of 1992 I was very worried about finances due to the divorce and I reapplied for Social Security benefits. I was turned down again.
>
> 11. At that time someone gave me the name of a lady who said she would help me with my claim and she filed a request for reconsideration for me. Her name was Nina Ragay-Lundkvist. She was not an attorney. I don't remember exactly why she didn't continue with it but I think she may have been worried about getting paid. In any event she dropped me and I was not up to continuing the claim on my own. I am quite sure that Social Security did not tell me at that time that if I did not continue with the claim and have a hearing and instead I reapplied I could lose out on benefits. Instead, they told me that my claim had already been decided against me and that they were not changing the decision.
>
> 12. Without anyone to help me I wasn't able to take the case any further and

I just let it drop until I could get someone to help.

13.  Several years later the MS Society told me about Mr. Jackson [her current counsel] and I spoke to him about whether anything could be done on my claim.

2007 Freese Aff. ¶¶ 6-13.

### III. Analysis

The plaintiff contends that she makes out colorable claims of due-process violations with respect to (i) her 1979 application, on the ground that she was misled by constitutionally flawed language contained in her notice of initial denial, *see* Statement of Errors at 3-4; Opposition at 1-7, (ii) her 1991 application, on the basis that her MS and depression rendered her unable to understand or take action on her initial notice of denial, *see* Statement of Errors at 4-5; Opposition at 7-9, and (iii) her 1992 application, on the ground that she again was misled by constitutionally flawed language contained in her notice of initial denial, *see* Statement of Errors at 4; Opposition at 9-10.

The commissioner counters that the plaintiff falls short of making out a colorable constitutional claim as to any of these applications and, hence, fails to carry her burden to demonstrate that the court has subject-matter jurisdiction to examine the refusal to reopen them.  *See generally* Motion; Defendant's Response to Plaintiff's Opposition to Defendant's Motion To Dismiss ("Reply") (Docket No. 13).  For the reasons that follow, I agree.

### A. 1979 Application

The commissioner concedes, solely for purposes of resolution of the instant motion, that the notice his agency sent to the plaintiff denying her 1979 application contained constitutionally deficient language.  *See* Motion at 3; Reply at 2 n.1.  The notice advised, in relevant part: "If you do not request reconsideration of your case within the prescribed time period, you still have the right to file another application at any time."  Record at 87.  The commissioner acknowledges that numerous courts have

found this language, used in many pre-1990 initial denial letters, constitutionally deficient because it "falsely assured plaintiff[s] that [they] could file another claim 'at any time,' when in fact [they] faced a four-year deadline." Motion at 3 (quoting *Butland v. Bowen*, 673 F. Supp. 638, 641 (D. Mass. 1987)).

The commissioner nonetheless contends that, in the circumstances of this case, no colorable constitutional claim is presented. *See id*. at 3-4. This is so, he reasons, inasmuch as: (i) by amending her alleged onset date from September or November 1979 to July 15, 1984, the plaintiff effectively conceded she was not disabled prior to that time, and (ii) she therefore has no constitutionally protected property interest in reopening of the 1979 application. *See id*. at 4-5; Reply at 2-4. The commissioner represents that, to his knowledge, his argument presents a question of first impression. *See* Reply at 4. My research likewise unearths no case on point. While novel, his argument is persuasive.

"To establish a constitutionally protected property interest, a plaintiff must have more than an abstract need or desire for a thing and more than a unilateral expectation of it." *Redondo-Borges v. United States Dep't of Hous. & Urban Dev*., 421 F.3d 1, 8 (1st Cir. 2005) (citation and internal punctuation omitted). "A plaintiff instead must have a legitimate claim of entitlement to it." *Id.* (citation and internal quotation marks omitted). An individual seeking to invoke constitutional due-process protections bears the burden of establishing that a life, liberty or property interest is at stake. *See, e.g., Wilkinson v. Austin*, 545 U.S. 209, 221 (2005).

As the plaintiff points out, *see* Opposition at 2-3, the Supreme Court has embraced the proposition that Social Security applicants possess a sufficient property interest in the prospect of award of benefits to be entitled to Fifth Amendment procedural due process with respect to adjudication of their applications:

> We may accept the propositions advanced by the claimant, some of them long established, that procedural due process is applicable to the adjudicative administrative proceeding involving the differing rules of fair play, which through the years, have become associated with differing types of proceedings; that the 'right' to Social Security benefits is in one sense 'earned'; and that the extent to which procedural due process must be afforded the recipient is influenced by the extent to which he may be condemned to suffer grievous loss.

*Richardson v. Perales*, 402 U.S. 389, 401-02 (1971) (citations and internal quotation marks omitted). Other courts since have followed suit. *See, e.g., Flatford v. Chater*, 93 F.3d 1296, 1304-05 (6th Cir. 1996) ("Because the Supreme Court has assumed in *Perales* that a social security applicant has 'more than a unilateral expectation' of a benefit, and because this assumption is necessary to the holding in that case (that due process applied) we proceed on the same basis. Thus, we will assume that Flatford has a property interest in the benefits he claims.") (citation omitted); *Gonzalez v. Sullivan*, 914 F.2d 1197, 1203 (9th Cir. 1990) ("Appellant is no longer working and alleges that he cannot work because of his physical maladies. He therefore has a significant property interest in receiving disability benefits. An applicant for social security benefits has a property interest in those benefits."); *Howard v. Apfel*, 17 F. Supp.2d 955, 966 (W.D. Mo. 1998) ("Social Security disability applicants possess a sufficient claim of entitlement to trigger a protected property interest. In this case, there is no question that plaintiff has a protected property interest in that she has already been found disabled and but for the alleged untimely request for an administrative hearing after the first denial, plaintiff would have received disability benefits dating back to her original onset date.") (citation omitted).

In this case, however, at her 2005 hearing the plaintiff amended her alleged date of onset of disability from September or November 1979 to July 15, 1984. *See* Record at 145, 404. The plaintiff protests that, in so doing, she did not concede she was not disabled prior to July 15, 1984; she goes so far as to maintain that, "[a]s a factual matter, [she] was disabled in 1979." Opposition at 6. She explains:

9

> Unfortunately, by the time this case was actually being considered on the merits by an ALJ many years later, Dr. Bachrach, her primary physician at that time, had retired or left practice and his records could not be located. As a result that evidence was no longer available to help to prove her case. Had this case gone forward in a timely way, Plaintiff could have had that additional evidence to prove her disability as of her 1979 application. However, by the time the case was before the ALJ, many years later, counsel had to make strategic choices based on the proof still available and thus amended the onset date to 1984 to coincide with the existing records.

*Id*. (footnote omitted).

The plaintiff makes a fair point: While she did indeed amend her alleged onset date, she never went so far as to concede that she was not disabled prior to July 15, 1984. *See* Record at 389, 404. Nonetheless, her counsel did effectively concede – and acknowledges today – that she lacks the evidence to prove she was disabled prior to her amended alleged onset date. *See id*.; *see also* Opposition at 6-7. It is difficult to discern how someone who concededly has insufficient evidence to support a finding of disability in a certain time frame possesses "a legitimate claim of entitlement" to disability benefits stemming from an application filed during that time.

Seemingly aware that the onset-date amendment could pose a problem for the bid to reopen the 1979 application, the plaintiff's counsel took the precaution of asking that the 1979 application be reopened and treated as having still been pending in 1984. *See* Record at 389. This was a neat solution: If the 1979 application still had been pending as of the amended onset date, it could have continued to provide a platform for benefits, concession notwithstanding. This would have been the case because, as the plaintiff points out, *see* Opposition at 7, the date of an administrative law judge's decision generally is "the relevant cut-off point for analysis of all factors on which the determination of disability vel non is based[,]" *Levesque v. Barnhart*, 78 Soc. Sec. Rep. Serv. 599, 601 (D. Me.

2002) (rec. dec., *aff'd* Aug. 7, 2002).[5]

Unfortunately for the plaintiff, the administrative law judge declined to accede to her counsel's request. She neither argues that he was obliged to do so nor offers any evidence tending to show that the 1979 application otherwise would have remained pending in 1984. As the commissioner points out:

> Plaintiff seeks to recover by judicial order what she voluntarily gave up in the interests of expediency at her 2005 hearing on remand. She requests that this Court make an entirely unsupported assumption that her 1979 application, if appealed, would still have been pending when she became disabled in July, 1984 – effectively gifting her the award of approximately sixteen years of retroactive DIB payments to which she passed up the opportunity to prove entitlement at her 2005 administrative hearing.

Reply at 7.[6]

In short, the plaintiff fails to meet her burden of demonstrating that she harbors a protected property interest with respect to her bid to reopen her 1979 SSD application. She accordingly falls short of making out a colorable constitutional claim. In the absence of such a showing, the court lacks jurisdiction to review the refusal to reopen the 1979 application.

## B. 1991 Application

The plaintiff shifts focus with respect to her 1991 application, resting her claim of a due-process violation not on the language of the initial denial notice but rather on her mental state at the

---

[5] In SSD cases, the relevant disability-determination date is the claimant's date last insured. *See Levesque*, 78 Soc. Sec. Rep. Serv. at 602. As a practical matter, however, the relevant date remains the decision date unless the claimant's date last insured precedes the date of decision.

[6] The plaintiff lays at least some of the blame for the lack of evidence proving she was disabled prior to July 15, 1984 at the feet of the commissioner, arguing that had the initial-denial notice not been flawed, she would have taken a timely appeal, and had she done so, she would have had available Dr. Bachrach's records to prove her case. *See* Opposition at 6 & n.3. Assuming *arguendo* that such fault on the part of the commissioner could bridge the gap in the plaintiff's showing of a legitimate claim of entitlement to benefits, she falls short of adducing sufficient evidence to buttress her argument. She does not explain why she did not provide Dr. Bachrach's records at the time of her application and offers no summary of what she believes they would have shown. Nor does she expressly state, in her 2007 affidavit, that she would have obtained and submitted the Bachrach records were it not for the flawed initial-denial notice. *See generally* 2007 Freese Aff.

11

time, which she contends rendered her unable to comprehend or act upon her appeal rights in the absence of representation by counsel. *See* Statement of Errors at 4-5; Opposition at 7-9. "Such an argument, when factually supported, has gained a favorable judicial reception." *Boothby v. Social Sec. Admin. Comm'r*, No. 97-1245, 1997 WL 727535, at *1 (1st Cir. Nov. 18, 1997). In a posture such as this, a claimant's medical evidence need not "definitively establish[] that [he or she] was unfit to pursue . . . administrative remedies." *Id*. (citation and internal quotation marks omitted). Instead, "the relevant inquiry here is whether a 'colorable' due process violation has been demonstrated." *Id.* While "[t]his is not an onerous standard[,]" *id*., the First Circuit, this court and other courts have held that claimants have vaulted the colorable-claim hurdle when they have adduced evidence (apart from their own affidavits) tending to show not only that they suffered at the relevant time from a mental impairment or condition but also that the impairment or condition affected their ability to understand and/or pursue appeal rights, *see, e.g., Byam v. Barnhart*, 336 F.3d 172,183 (2d Cir. 2003) (claimant presented colorable due-process claim when there was "record evidence of [her] long history of depression, suicidal ideation with specific suicide attempts, and numerous evaluations around the dates of her SSI applications documenting specific mental disorders and cognitive, social, and emotional impairments"); *Boothby*, 1997 WL 727535, at *2 (claimant presented colorable due-process claim when one doctor, "although reporting well after the events in question, spoke of an organic disorder with significantly compromised mental functions, variable attention span, impaired concentration levels, depressive symptomology and substandard reading ability" and second doctor, on whom commissioner relied, "spoke of an emotionally unstable personality disorder with strong sociopathic and alcoholic features, a borderline-defective intellect, a chronic difficulty in maintaining any level of responsibility, and an inability to handle funds"); *Leo v. Apfel*, Docket No. 00-212-P-C, slip op. at 3-4, 6-7 (D. Me. Oct. 27, 2000) (rec. dec., *aff'd* Nov. 20, 2000) (claimant presented

colorable due-process claim when she averred, and psychologist submitted retrospective opinion corroborating, that her depression impeded her from pursuing steps necessary to request reconsideration of initial denial of first application); *Leach v. Apfel*, No. 00-92-B, 2000 WL 1511197, at *2, *4 (D. Me. Oct. 5, 2000) (rec. dec.; case remanded on motion of comm'r Oct. 27, 2000) (claimant presented colorable due-process claim when he pointed to evidence that, at approximately the same time as the relevant appeals period, a Disability Determination Services consulting examiner found him to be suffering from mental impairments that affected his ability to process information); *compare, e.g., Dudley v. Apfel*, 69 Soc. Sec. Rep. Serv. 327, 330 (D. Me. 2000) (rec. dec., *aff'd* Apr. 17, 2000), *aff'd*, 2 Fed. Appx. 61 (1st Cir. 2001) (claimant failed to make out colorable due-process claim when he provided no material beyond his memorandum, and the only evidence addressing his mental status in the record before court was reports of physician and psychologist that did not address his condition during time period in question; in addition, psychologist's later diagnosis did "not mention any inability to understand documents such as a notice of appeal rights . . ., nor does it allow the reader to draw the inference that such an inability existed at that time"); *Babin v. Apfel*, No. 99-28-B, 1999 WL 33117080, at *4 (D. Me. July 22, 1999) (rec. dec., *aff'd* Aug. 30, 1999) (claimant failed to make out colorable due-process claim when he did not apply for benefits based on a mental condition, only record evidence of depression concerned an episode that was fully resolved prior to relevant appeals period, and only evidence before Appeals Council or court concerning mental status during appeals period was his own affidavit).

      The plaintiff's 1991 SSD application was denied by notice dated October 23, 1991. *See* Record at 89. That notice indicated, in relevant part, that if the plaintiff wished to seek reconsideration, she was required to do so within sixty days from the date she received the notice. *See id.* The plaintiff avers that, as a result of her MS and serious depression resulting from the 1990

13

discovery of cancerous cells in her uterus, requiring a hysterectomy, and the 1991 breakup of her marriage of more than thirty years, she "was not able to understand or respond in any way to the denial [she] got from Social Security during the 60 day appeal period from October into December, 1991." 2007 Freese Aff. ¶ 8. She also points to pages 245, 270-71, 278 and 293 of the Record, *see* Statement of Errors at 5; Opposition at 8, which document that she was diagnosed in October 1990 with adenocarcinoma in situ of the cervix, *see* Record at 245-46, was diagnosed by Gary L. Green, M.D., in August 1991 with a grief reaction after being told by her husband of thirty-two years that he was moving out and moving in with a younger woman, *see id.* at 293-94, was advised by Dr. Green on March 20, 1992 that she ought to discuss with her neurologist increasing the dosage of Pamelor the neurologist had prescribed for depression, *see id.* at 278, and received counseling for depression from Harrison, a licensed social worker, following the breakup of her marriage, *see id.* at 270-71.

There can be no serious question that the plaintiff had ample cause for feeling depression, grief and stress during the relevant appeals period (from October to December 1991) and that she did in fact experience those things then. *See, e.g., id.* at 293 (August 8, 1991 note of Dr. Green documenting that plaintiff was "quite anxious and tearful"), 290 (October 15, 1991 note of Harrison stating that plaintiff's MS had flared up somewhat, she had realized she needed to lower her overall level of stress and she was depressed from time to time, although not suicidal), 288 (October 29, 1991 note of Harrison describing plaintiff as "enmeshed in a real grieving process where she is feeling a myriad of feelings related to loss").

Nonetheless, as the commissioner argues, *see* Reply at 18-19, one cannot fairly infer from the contemporaneous records that these conditions prevented the plaintiff from either understanding or

14

pursuing her appeal rights.[7] As the commissioner points out, *see id.*, Harrison's counseling notes document that the plaintiff was able to consult counsel, *see* Record at 290, make substantive legal decisions and instruct her attorney accordingly, *see id.* at 287, and comprehend disputed legal issues impacting her financial well-being during an eight-month period of her separation and divorce that included the sixty-day appeals period in issue, *see id.* at 275, 281, 287.[8] Moreover, while Harrison described the plaintiff in a June 30, 1992 Report of Individual with Mental Impairment as having increased difficulty with short-term memory and a shortened attention span and forgetting tasks she had started, he reported that she had "no real problems" with her ability to think, reason and respond, "except [that it] takes her longer than it used to." *Id.* at 270.

For these reasons, the plaintiff falls short of making out a colorable claim of due-process violation in connection with denial of her 1991 application.[9] The court therefore lacks jurisdiction to review the commissioner's refusal to reopen that application.

---

[7] Counsel for the commissioner overlooked, and hence failed to address in the motion to dismiss, the plaintiff's mental-state argument, which was set forth in the final paragraph of the Statement of Errors. *See generally* Motion; *see also* Reply at 11-12 n.4; Statement of Errors at 4-5. Upon realizing her error, counsel addressed the point thoroughly in her reply brief. *See* Reply at 11-19. While mention of an issue for the first time in a reply brief can be fatal to its consideration, *see, e.g., In re One Bancorp Sec. Litig.*, 134 F.R.D. 4, 10 n.5 (D. Me. 1991) (court generally will not address an argument raised for the first time in a reply memorandum), I have taken the commissioner's belated argument into account inasmuch as it bears on a question that the court has an obligation to consider even *sua sponte*: whether it has subject-matter jurisdiction, *see, e.g., White v. Gittens*, 121 F.3d 803, 806 (1st Cir. 1997) ("It is too elementary to warrant citation of authority that a court has an obligation to inquire sua sponte into its subject matter jurisdiction, and to proceed no further if such jurisdiction is wanting.") (citation and internal quotation marks omitted).

[8] As the commissioner points out, *see* Reply at 18-19, it is notable that the plaintiff reported on November 5, 1991 (approximately two weeks after issuance of the notice of denial) that "she had finally made a decision to file for divorce herself and she had talked with an attorney yesterday, who was getting the papers drawn up[,]" Record at 287. The commissioner reasonably observes: "Neither Plaintiff nor the record evidence indicates why she was able to comprehend her legal rights and take the necessary steps in the context of her divorce, but not in that of her pending DIB application." *See id.* at 19.

[9] The plaintiff also invokes Social Security Ruling 91-5p ("SSR 91-5p") as a basis for review of the decision not to reopen the 1991 application. *See* Statement of Errors at 5; Opposition at 7-9. The result is the same under that ruling. Pursuant to SSR 91-5p, "The claimant will have established mental incapacity for the purpose of establishing good cause when the evidence establishes that he or she lacked the mental capacity to understand the procedures for requesting review." SSR 91-5p, reprinted in *West's Social Security Reporting Service* Rulings 1983-1991, at 810; *see also, e.g., Jenks v. Shalala*, No. 93-C-117-K, 1994 WL 776896, at *3 (N.D. Okla. Nov. 28, 1994) ("There is no evidence in this record that plaintiff's mental impairment was so severe that she was incapable of knowing her rights or the consequences of her actions, or lacked the mental capacity to understand the review process. The ALJ determined the provisions of Social Security Ruling 91-5p did not apply, and this Court concurs."). As discussed above, the plaintiff's
*(continued on next page)*

### C. 1992 Application

The commissioner concedes that, "[f]or unknown reasons, the August 1, 1992 denial notice included the same inadequate language as did the 1979 Notice." Motion at 8; *see also* Reply at 2 n.1. He contends, however, that (i) a claimant must demonstrate not only that notice was inadequate but also that he or she relied to her detriment upon it, and (ii) the plaintiff, who sought reconsideration despite the flawed language, does not do so here. *See* Motion at 8-9. I agree.

In *Gilbert v. Sullivan*, No. 93-2309, 1995 WL 91120 (1st Cir. Mar. 6, 1995), as here, a Social Security claimant sought judicial review of a refusal to reopen a prior application on the basis of existence of a due-process violation stemming from inadequate notice. *See Gilbert*, 1995 WL 91120, at *1. The First Circuit held:

> [W]e believe that reliance on the defective notice is a core ingredient of claimant's *prima facie* showing of a due process deprivation. Without such reliance, the injury is not fairly traceable to the challenged action. Only claimants who detrimentally relied on an inadequate notice could have been injured by it and were entitled to reopen their applications. Thus, to succeed on the merits of her constitutional claim, Gilbert must show that she relied on the flawed notice and was prejudiced.

*Id.* at *2 (citations omitted).[10]

---

evidence does not reveal that such a lack of mental capacity resulted from her depression and MS during the relevant period.

[10] I am mindful that the *Gilbert* court found that the plaintiff had asserted a colorable constitutional claim based on the existence of the flawed notice language (thereby conferring subject-matter jurisdiction), then went on to determine on the merits that the plaintiff had detrimentally relied on that notice. *See Gilbert*, 1995 WL 91120, at *2-*3. Nonetheless, I do not construe *Gilbert* as holding that a plaintiff in these circumstances may dispense with any showing of detrimental reliance and yet make out a colorable constitutional claim. Such a holding would place the First Circuit at odds with all United States circuit courts of appeals that have considered the question save for the United States Court of Appeals for the Ninth Circuit. *See Loudermilk v. Barnhart*, 290 F.3d 1265, 1268-69 (11th Cir. 2002) (noting, in response to claimant's argument that he needed only show flawed notice language to make out colorable due-process violation claim for purposes of conferring jurisdiction to review refusal to reopen Social Security application: "In *Lujan v. Defenders of Wildlife*, [504 U.S. 555 (1992),] the Supreme Court held there must be a causal connection between the injury and the complained of conduct. All the circuit courts considering the Social Security determination notice issue, with the exception of the Ninth Circuit, require a causal connection, following the Supreme Court's dictate in *Lujan*. In implementing this requirement, the courts hold the claimant must have detrimentally relied upon the notice. We find the reasoning and, therefore, the test employed by the majority of the circuits more persuasive in light of the teachings of *Lujan*.") (citations omitted).

16

There is no dispute that, after receiving the flawed initial-denial notice in question, the plaintiff sought reconsideration. *See* Record at 94-95. The plaintiff contends that she nonetheless makes out a colorable due-process claim in that (i) the reconsideration denial notice did not correct the misimpression left by the flawed initial-denial notice (that the plaintiff could apply again any time without risk of loss of benefits), (ii) she did not appeal the reconsideration denial, and (iii) "[u]nder those circumstances, the constitutionally defective notice was the final word on this issue and [the plaintiff] had no reason to know that a failure to appeal and a choice to wait until she again had someone to help would prejudice her claim further." Opposition at 10.

While it is conceivable that a Social Security applicant could make out a colorable claim of due-process violation based on the commissioner's failure to correct a misimpression left by an earlier denial notice, the plaintiff does not do so here. She does not state that, as a result of the flawed initial-denial language, she refrained from appealing the reconsideration denial. *See* 2007 Freese Aff. ¶¶ 10-13. Rather, she indicates that she failed to appeal at that juncture because she lost the services of her non-attorney representative (who had filed the earlier request for reconsideration for her), and she was not up to continuing the claim on her own. *See id*. As the commissioner observes, *see* Reply at 10, one cannot reasonably discern in that set of circumstances detrimental reliance on the flawed 1992 initial-denial language, *see also, e.g., Loudermilk,* 290 F.3d at 1270 ("Detrimental reliance does not exist in the present dispute. . . . Loudermilk testified at length that his failure to follow through with the initial application was due to his mental condition, which by implication, means Loudermilk could not have relied upon the defective notice. If Loudermilk had in fact been mislead by the notice, he would have requested a hearing or filed a new application within a reasonable time after receipt of the defective notice. Instead, Loudermilk waited more than four years before filing the second application.") (footnote omitted); *Burks-Marshall v. Shalala*, 7 F.3d 1346, 1349-50 (8th Cir. 1993)

17

("We conclude that the claimant has no standing to raise the due-process issue. She has not shown that the alleged deficiency in the notice had any connection in fact with her own failure to seek review of the two early denials. The power to decide constitutional issues is a delicate one. It is reserved for those cases where the answer to the constitutional question makes a real difference to a person before the court. . . . The claimant suggests that she was assured that she did not need a lawyer, that the ALJ would take care of her interests, but this is a different point. She does not say that after reading the notice she understood it to mean that she could apply again at any time for benefits for the periods involved in her denied claims, and that, for that reason, she decided to forego further review at the time."); *Brooks v. Apfel*, 71 F. Supp.2d 858, 864 (N.D. Ill. 1999) ("While the court sympathizes with Brooks' situation here, its hands are tied. . . . Brooks never makes plain that the defective notice caused him to file an untimely request for reconsideration of his claim.").

The plaintiff having failed to set forth a colorable claim of due-process violation in connection with her 1992 application, the court lacks jurisdiction to review the commissioner's refusal to reopen it.

## IV. Conclusion

For the foregoing reasons, I recommend that commissioner's motion to dismiss be **GRANTED**.

### *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum, within ten (10) days after being served with a copy thereof. A responsive memorandum shall be filed within ten (10) days after the filing of the objection.*
*Failure to file a timely objection shall constitute a waiver of the right to de novo review by*

*the district court and to appeal the district court's order.*

>Dated this 12th day of September, 2007.

/s/ David M. Cohen
David M. Cohen
United States Magistrate Judge
